**Carmen V. COOK, individually and as Personal Representative of the Estate of Irving Robert Cook, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 93–962–Civ–Orl–22.

United States District Court,
M.D. Florida,
Orlando Division.

June 21, 1995.

Carmen V. Cook, pro se.

Bruce T. Russell, U.S. Dept. of Justice, Tax Division, Washington, DC, for Defendant.

---

## MEMORANDUM DECISION AND ORDER

CONWAY, District Judge.

There are times when the revenue laws of the United States yield harsh results. This is one of those times.

### I. PROCEDURAL HISTORY

The present plaintiff, Carmen V. Cook ("Mrs. Cook"), and her husband, Irving R. Cook ("Mr. Cook"), instituted this action on November 1, 1993. The Cooks sought a partial or full refund of their 1991 federal income tax. Before the case came to trial, Mr. Cook died. The morning of trial, the Court substituted Mrs. Cook, in her capacity as personal representative of her husband's estate, in place of Mr. Cook. Mrs. Cook's individual and representative claims were tried by the Court, without a jury, on May 4, 1995. Mrs. Cook appeared *pro se.*

### II. FACTS

Mr. Cook was a military member of the United States Navy for nearly eight years. In 1950, he retired based on disability resulting from encephalitis, and began to receive a nontaxable, service-connected disability pension. Mr. Cook was hired in 1952 by the Department of the Navy as a Civil Service employee.

On June 30, 1972, Mr. Cook retired from the Department of the Navy in lieu of being separated by a reduction-in-force. Mr. Cook's Application for Retirement reflects that he had seven years and approximately six months of active military service and that he was not receiving military retired pay.[1] Def.Ex. 11. Based on this information, Mr. Cook was credited for his prior military service in determining his eligibility for an immediate civil service retirement annuity, and for the purpose of computing annuity benefits. In general, "active military service that forms the basis for payment of retired pay can be used in the computation of a civil service annuity only if the retiree waives receipt of the [military] retired pay for civil service retirement purposes."[2] Def.Ex. 7; Pretrial Statement (Dkt. 27) at 13. Mr. Cook did not waive receipt of his military retirement pay when he applied for his civil service retirement.[3]

Mr. Cook was awarded a civil service discontinued service retirement commencing July 1, 1972. Thereafter, he received a civil service retirement pension, while also receiving his military disability retirement pension.

On August 13, 1986, the Office of Personnel Management ("OPM") notified Mr. Cook that an audit of the civil service and Navy retirement rolls revealed that he was in fact receiving civil service benefits based in whole or in part on his active military service. Def.Ex. 7; *see also,* Def.Ex. 6. "Since there was no indication that the [military] retired pay had been waived for civil service retirement purposes, [OPM] advised Mr. Cook that

---

**1.** The question on the form relating to military retired pay reads: "ARE YOU IN RECEIPT OF OR HAVE YOU EVER APPLIED FOR MILITARY RETIRED PAY? (Retired pay does not include V.A. pension or compensation.)" Below the question, the "NO" block is checked. However, it appears that at some point the "YES" block was also checked, then later partially erased or blotted out with correction fluid. Mrs. Cook argues that her husband would not have changed his response in that manner, based on the fact that he changed one of his responses on the second page of the form by merely crossing it out, rather than erasing it or blotting it out with correction fluid. She contends that someone else must have changed the "YES" response to a "NO" response. She maintains that her husband likely would have asked for assistance in completing the form. As discussed *infra,* two separate federal agencies determined that Mr. Cook was not at fault in causing or contributing to the overpayment of retirement benefits. Implicit in those determinations is that Mr. Cook was not at fault with respect to the manner in which his retirement application was completed.

**2.** The result is otherwise when the military retired pay is based on a service-connected disability "incurred in combat with an enemy of the United States", or "caused by an instrumentality of war and incurred in [the] line of duty during a period of war as defined by section 301 of title 38." 5 U.S.C. § 8332(c)(2)(A).

**3.** According to Mrs. Cook, her husband could have converted his military disability retirement to a Veterans Administration disability pension and still received credit for his military service for civil service retirement purposes. Mrs. Cook believes that the personnel who processed her husband's retirement should have advised him of that option, but did not do so.

credit had been erroneously allowed for his military service in the computation of his civil service annuity." Def.Ex. 7. OPM terminated Mr. Cook's discontinued service annuity because, without credit for his military service, he was not entitled to an immediate annuity. *Id.* Further, OPM notified Mr. Cook that he had been overpaid $97,636.93 in civil service retirement payments during the period July 1, 1972 to July 31, 1986. Additionally, OPM terminated Mr. Cook's coverage under the Federal Employees Life Insurance Program.

Mr. Cook asked OPM to reconsider its decision and to waive collection of the overpayment. In December 1986, OPM affirmed its determination that "the inclusion of military service in the computation of [Mr. Cook's civil service] annuity benefits was erroneous", as well as *its decision to terminate* Mr. Cook's life insurance coverage. Pltf.Ex. 5. However, pursuant to 5 U.S.C. § 8346(b)[4], OPM waived collection of all but $5,000.00 of the overpayments, on the basis that Mr. Cook was not at fault in causing or contributing to the overpayment and that recovery would be against equity and good conscience. *Id.* OPM later waived collection of the remaining $5,000.00 on the basis that Mr. Cook's financial condition had deteriorated. Jt.Ex. 6.

In June 1990, Mr. Cook elected to waive receipt of his Navy military disability retirement pay, retroactive to July 1, 1972, for civil service retirement purposes. Jt.Ex. 2 (June 19, 1990 letter from Mr. Cook to A.J. Brown, OPM; attached to Form 1040X for 1991).[5] This allowed OPM to credit Mr. Cook's years

of military service toward civil service retirement. OPM determined that "Mr. Cook was due a total of $28,328.00 in annuity for the period of August 1, 1986, the date his annuity had been terminated, through July 31, 1990, the date his annuity was fully restored." Def.Ex. 7 at 2.

Based on this waiver, the Navy discontinued disability retirement payments to Mr. Cook. *Id.* However, Mr. Cook's retroactive waiver created an overpayment of Navy disability retirement benefits in the amount of $64,791.35. *Id.* Consequently, the Navy asked OPM to withhold that amount from Mr. Cook's civil service retirement payments, and to remit it to the Navy in order to satisfy the overpayment debt. *Id.* OPM sent the $28,328.00, to which Mr. Cook otherwise would have been entitled, to the Navy in partial satisfaction of the overpayment debt to the Navy, and began withholding the balance in installments from Mr. Cook's monthly civil service annuity. *Id.*

Mr. Cook asked the Navy to waive collection of the $64,791.35 overpayment. The Navy forwarded that request to the Comptroller General, along with its own request that the government's overpayment claim be waived pursuant to the provisions of 10 U.S.C. § 2774.[6] Jt.Ex. 3. The General Accounting Office approved the request on June 26, 1991. Jt.Ex. 4. At the time of this decision, the Cooks were not insolvent.

In September 1991, the Navy sent Mr. Cook a check in the amount of $24,805.60. Jt.Ex. 5. This sum represented "the amount

---

4. In pertinent part, § 8346(b) provides that "[r]ecovery of [retirement] payments may not be made from an individual when, in the judgment of the Office of Personnel Management, the individual is without fault and recovery would be against equity and good conscience."

5. When Mr. Cook separated from military service, the Navy rated his disability at 50%. Pltf. Ex. 20. At trial, Mrs. Cook indicated that after *OPM notified her husband of the civil service overpayment,* he learned for the first time from his congressman's office that he could "convert" his Navy disability to VA. She said Mr. Cook later "switched" to VA, but only received a 30% *disability rating from that agency.* Mrs. Cook further indicated that her husband continued to collect 20% disability payments from the Navy

based on *the Navy's higher disability rating, and* that these remaining benefits were the subject of Mr. Cook's 1990 waiver.

6. Section 2774(a) permits the Comptroller General to waive "[a] claim of the United States against a person arising out of the erroneous payment of any pay or allowances ... to ... a ... former member of the uniformed services, the collection of which would be against equity and good conscience and not in the best interest of the United States[.]" Subsection (b)(1) of the statute prohibits the Comptroller General from waiving any claim "if, in his opinion, there exists, in connection with the claim, an indication of fraud, misrepresentation, fault, or lack of good faith on the part of the member[.]"

of $31,007.00 that was remitted to [the Navy] less withholding tax of $6,201.40 (federal)." *Id.*

The Defense Finance and Accounting Service issued a Form 1099–R, characterizing the $64,791.35 waived overpayment as taxable income. Def.Ex. 2. The Cooks initially included the $64,791.35 as income on their 1991 federal income tax return. Def.Ex. 3. They had to refinance their home in order to pay the tax generated by the additional income. In August 1992, the Cooks filed an amended 1991 tax return (Form 1040X) in which they sought to decrease their adjusted gross income by $64,791.35, the amount of the forgiven debt, and to obtain a refund in the sum of $17,087.00. Jt.Ex. 2. In their amended return, the Cooks stated: "AMENDED TO DELETE FROM ORIGINAL RETURN A PENSION OF $64791 WHICH SHOULD BE CONSIDERED AS NON–TAXBLE [sic]. SEE ATTACHED INFORMATION FOR AN EXPLANATION." Attached to the return are various letters relating to the Navy overpayment.

The Internal Revenue Service did not issue the Cooks a refund.

### III. RELEVANT LAW

Title 26, United States Code, Section 61(a), generally defines gross income. In pertinent part, the statute provides:

(a) **General Definition.**—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\*      \*      \*      \*      \*      \*

(12) Income from discharge of indebtedness[.]

Treasury Regulation § 1.61–12 provides, in pertinent part, as follows:

(a) In general. The discharge of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, the debtor realizes income in the amount of the debt as compensation for his services. A taxpayer may realize income by the payment or purchase of his obli-

gations at less than their face value. In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt.

Title 26, United States Code, Section 108 is entitled "Income from discharge of indebtedness." In pertinent part, the statute provides:

(a) **Exclusions from gross income.**—

(1) **In general.**—Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—

\*      \*      \*      \*      \*      \*

(B) the discharge occurs when the taxpayer is insolvent[.]

\*      \*      \*      \*      \*      \*

(d) **Meaning of terms[.]**—

(1) **Indebtedness of taxpayer.**—For purposes of this section, the term "indebtedness of the taxpayer" means any indebtedness—

(A) for which the taxpayer is liable[.]

\*      \*      \*      \*      \*      \*

(3) **Insolvent.**—For purposes of this section, the term "insolvent" means the excess of liabilities over the fair market value of assets. With respect to any discharge, whether or not the taxpayer is insolvent, and the amount by which the taxpayer is insolvent, shall be determined on the basis of the taxpayer's assets and liabilities immediately before the discharge.

Title 26, United States Code, Section 102, provides, in pertinent part, that "[g]ross income does not include the value of property acquired by gift[.]" The most critical factor in determining whether a transaction involving debt forgiveness constitutes a gift is the donor's intent. *See, Putoma Corp. v. C.I.R.,* 601 F.2d 734, 749 (5th Cir.1979) (citing *C.I.R. v. Duberstein,* 363 U.S. 278, 285–86, 80 S.Ct. 1190, 1196–97, 4 L.Ed.2d

1218 (1960)); *see also, Sutphin v. United States,* 14 Cl.Ct. 545, 549 (Cl.Ct.1988) ("the presence or absence of donative intent on the part of the creditor becomes dispositive"). "A gift in the statutory sense ... proceeds from a detached and disinterested generosity[,] out of affection, respect, admiration, charity or like impulses." *Putoma,* 601 F.2d at 748 (quoting *Duberstein,* 363 U.S. at 285, 80 S.Ct. at 1196–97, internal quotations and citations omitted); *see also, Sutphin* 14 Cl. Ct. at 549 (based on fact that purported donor "did not act with a detached and disinterested generosity arising from affection, respect, admiration, charity or like impulses", court determined that discharge of indebtedness was not a gift).

## IV. ANALYSIS

Prior to trial, the parties stipulated that the only remaining issue for determination by the Court was "[w]hether the assessment of the additional 1991 income tax in issue by the Commissioner of Internal Revenue was proper." Dkt. 27 at 16–17.

At trial, Mrs. Cook appeared to challenge the validity of the underlying overpayment debt to the United States. The United States took the position from the outset that the question of the enforceability of the debt was not a trial issue, and that the only question before the Court was whether the tax assessment was valid. Even if the abovequoted stipulation did not preclude Mrs. Cook's argument concerning the validity of the underlying debt, Mrs. Cook failed to prove at trial that the debt was unenforceable.

The parties also stipulated before trial that the Cooks were not "insolvent" within the meaning of 26 U.S.C. § 108 at the time the United States forgave the debt. Dkt. 27 at 14. The evidence at trial was consistent with this stipulation. In the Pretrial Statement, Mrs. Cook further agreed that "[n]one of the statutory exceptions to the rule that the cancellation of indebtedness is ordinary income to the debtor set forth in 26 U.S.C. § 108 is applicable in this case." Dkt. 27 at 16.

The only remaining basis on which Mrs. Cook might prevail is if the discharge of indebtedness constituted a gift to Mr. Cook.

However, Mrs. Cook did not present any evidence upon which the Court could find that the United States intended to make a gift to Mr. Cook. While there is no evidence of any consideration for the waiver, that fact alone is not dispositive. *See, Putoma,* 601 F.2d at 748 (" '[The Supreme Court] has indicated that a voluntarily executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a "gift" within the meaning of [the predecessor to § 102(a) ];' " quoting *Duberstein,* 363 U.S. at 285, 80 S.Ct. at 1196).

■ Moreover, "if the payment proceeds primarily from the constraining force of any moral or legal duty, ... it is not a gift." *Putoma,* 601 F.2d at 748 (quoting *Duberstein,* 363 U.S. at 285, 80 S.Ct. at 1196–97; internal quotations and citations omitted). While it may be that the United States was motivated by charity when it waived collection of the debt, it may also be that the United States acted on the basis that it owed a moral or legal duty to waive collection under the circumstances presented. Or, the United States may simply have made a business decision that, based on the Cooks' financial condition, the limited prospect of recovery did not justify the expense of collection. Under controlling legal authority, the latter two possible motives would not support a finding that the discharge of indebtedness was a gift.

Under these circumstances, the Court cannot properly rule that the discharge of indebtedness was a gift to Mr. Cook. Despite the fact that the government has essentially given with one hand and taken with the other, the Court is left with no choice but to rule in favor of the United States. The United States' discharge of the $64,791.35 debt generated taxable income in that amount to Mr. Cook in 1991. Accordingly, Mrs. Cook is not entitled to a refund of federal income taxes she and Mr. Cook paid in 1991.

## V. CONCLUSION

Based on the foregoing, it is ORDERED that the Clerk shall enter a judgment provid-

ing that the Plaintiff, Carmen V. Cook, individually and as Personal Representative of the Estate of Irving Robert Cook, shall take nothing on her claim against the United States.

**DONE AND ORDERED.**